IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILBERT GATES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 06 C 1408 |
| ) | |
| MICHAEL J. ASTRUE,[1] ) | Magistrate Judge Jeffrey Cole |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Wilbert Gates seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423(d) and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1382c(a)(3)(A). Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision denying plaintiff's application. For the reasons set forth below, the court denies plaintiff's motion and grants the defendant's motion.

### I.

### PROCEDURAL HISTORY

Wilbert Gates, applied for Disability Insurance Benefits and Supplemental Security Income on May 19, 2003, alleging that he became disabled on December 15, 2002 (R. 131), due to a heart

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security and is, therefore, substituted for Joanne B. Barnhart as the defendant herein pursuant to Fed.R.Civ.P. 25(d).

condition and tuberculosis which caused him chest pain and shortness of breath. (R. 134, 145-147, 163). After his claim was denied both initially and on reconsideration, Mr. Gates filed a request for a hearing on December 31, 2003. (R. 61). On August 23, 2005, an administrative law judge ("ALJ") conducted a hearing at which Mr. Gates, represented by counsel, appeared and testified. (R. 22-58). In addition, Dr. Hugh Savage testified as a medical expert. (R. 22, 37-58). In a decision dated September 12, 2005, the ALJ found that plaintiff was not disabled because he retained the ability to perform light work that exists in significant numbers in the national economy. (R.16-21). This became the final decision of the Commissioner when the Appeals Council denied Mr. Gates's request for review of the decision on February 8, 2006. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Gates has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## EVIDENCE OF RECORD

### A.

### Medical Evidence

The pertinent medical evidence dates back to April 5, 2003, when Mr. Gates was admitted to Cook County Hospital after experiencing chest pain and difficulty breathing. (R. 165, 199). A history of exposure to tuberculosis was noted. (R. 199). Mr. Gates related that his pain was sharp and intense at the time ("10/10" on severity scale), was further aggravated by motion, deep breathing, bending, and coughing, and that the discomfort could be alleviated by resting. (R. 200, 210, 353). He alleged shortness of breath after minimal physical exertion. (*Id.*). Mr. Gates explained that the

pain set in gradually over 5 days, was intermittent, and that it spread to his right and left arm at times. (*Id.*). Before being admitted to the hospital, he took Ibuprofen for the pain but that proved to be ineffective. (R. 355).

During his hospitalization, Mr. Gates continued to complain of intermittent, but considerable chest pain. Detailed inpatient progress reports from attending and treating physicians show that on April 7, 2003, Mr. Gates described his pain as "the same" and said he was not experiencing any increased shortness of breath at the time. (R. 275-76). On April 9, he denied any shortness of breath or chest pain while under medication. (R. 280-81). Mr. Gates felt more considerable pain the following day, which spiked from time to time. (R. 280-82). On April 10, 2003, he experienced more discomfort in his shoulders and neck, although the pain in his chest decreased. (R. 283).

Mr. Gates was diagnosed with pericarditis[2] or "pericardial effusion" which was drained on April 11, 2003, through a surgical procedure in the form of a biopsy or "pericardial window." (165-66, 208-09, 242, 300). He was also diagnosed with latent tuberculosis which doctors determined was likely the cause of his thickened pericardium and pleurisy.[3] (R. 234, 242). Mr. Gates was discharged on April 22, 2003. (R. 98). After the operation, physicians administered Morphine as necessary for pain (R. 287), and Mr. Gates recovered satisfactorily; records indicate that Plaintiff was asymptomatic as of April 12, 2003. (R. 300). On April 13, Mr. Gates complained of abdominal pain, and his morphine drip was increased in order to alleviate the tenderness. (R. 331). He also complained of sporadic pain at the insertion site of the pericardial chest tube, ranging in intensity from 6 to 9 out of 10. (R. 300-06).

---

[2] Fluid buildup in the sac-like membrane surrounding the heart. www.mercksource.com.

[3] Inflammation of the lining of the lungs. www.mercksource.com

3

Cook County Hospital staff monitored Mr. Gates for 10 days after surgery until his April 22 release. On April 15, 2003, Mr. Gates was alert and oriented times three with no shortness of breath, chest pain, distress, or edema. (R. 318). On April 16, 2003, he had no chest pains, experienced less difficulty breathing, and was in the process of recovering well. (R. 321). On April 17th, Mr. Gates had no complaints, denying any chest pain or shortness of breath (R. 316, 317), and said he slept "OK." (R. 334). The attending physician's note confirms that Mr. Gates's condition was clinically improving as of that day. (R. 336). On April 19th, Mr. Gates was progressing relatively well; he said he "want[ed] to leave badly" and "fe[lt] well enough to go home." (R. 337, 339). By April 21st, Mr. Gates had no new complaints and was ready to leave. (R. 341). An echocardiogram revealed no accumulation of fluid around the heart and that his Pericarditis was resolving. (R. 341).

Following his discharge, Mr. Gates continued to be seen as an outpatient. On May 7, 2003, Mr. Gates reported an absence of chest pain. The attending physician reported that Mr. Gates's "Pericardial effusion – symptomatically and clinically – seems to not have returned."(R. 195, 197). Mr. Gates was also asymptomatic for aortic insufficiency and aortic stenosis. (R. 195, 197). Doctors advised him to avoid strenuous activity. (R. 195). It was also noted that he had not been taking his tuberculosis/pericarditis medication[4] because someone told him "that it was dangerous," although he was instructed by doctors to remain on the anit-TB meds. (R. 195, 197). By July 2, 2003, doctors reported that there was "no pericardial effusion;" that it had "resolved" according to echocardiogram. (R. 194).

A clinical report dated July 10, 2003, indicates that Mr. Gates was experiencing some

---

[4] Plaintiff was placed on 9-month regimen of INH and Pyridoxine after being diagnosed with latent tuberculosis. (R. 242).

4

insomnia, but had not yet seen a cardiologist per recommendation. (R. 229) He reported that his "overall pain was not so bad." (R. 229). But he also said that his pain medication – Motrin – was not effective. (R. 229). The report also shows that Mr. Gates's condition had improved since discharge from Cook County Hospital. (R. 229).

By August 25, 2003, Mr. Gates reported that he had no cough, chills, fever, loss of appetite or abdominal pain. (R. 226). He no longer had shortness of breath while at rest or from deep breathing, but only as a result of exertion, such as climbing stairs. (R. 226). Chest pain was relieved with Ibuprofen. (R. 226). He claimed to be experiencing some insomnia – he had no trouble falling asleep, but woke up early. (R. 226). The attending physician expressed some suspicion over whether Mr. Gates was taking his tuberculosis medication, but Mr. Gates assured him he was. (R. 226).

Further medical records from the clinic report nothing different, except for a dental condition for which Mr. Gates was placed on antibiotics and additional pain killers. (R. 228). A September 3, 2003 follow-up noted occasional chest pains, lasting about 30 seconds, 1-2 times per week, that were unrelated to exertion. (R. 191). Mr. Gates explained that he was afraid to exert himself apparently because he was awaiting his cardiology exam which would provide further input on his state of health. (R. 191). In light of these complaints, doctors performed a full Doppler transthoracic echocardiography at Northwestern Memorial Hospital. (R. 186). The study revealed no regional wall motion abnormalities, normal size and systolic function of the right ventricle and mitral valve, normal tricuspid and pulmonic valves, and no residual pericardial effusion. (R. 186-7). There was moderate left ventricular enlargement, mild concentric left ventricular hypertrophy, bilateral enlargement, trace mitral regurgitation, and severe aortic regurgitation with mild aortic stenosis. (R.

5

187). Ejection fraction was within normal limits at 55% (http://www.mayoclinic.com/health/ejection-fraction/AN00360; http://heartdisease.about.com/cs/glossary/g/glejectionfrac.htm) and systolic function in the left ventricle was preserved. (R. 186).

In connection with his application for DIB and SSI, the Agency arranged for a consultative examination of Mr. Gates by Dr. Kenneth Gong on June 26, 2003. (R. 237-43). Dr. Gong noted a history of tuberculosis (Mr. Gates was diagnosed with latent infection eighteen months previously, around January 2001), syphilis (coincidentally, diagnosed eighteen months previously), thickened pericardium, and pleurisy. (R. 242). Mr. Gates complained of shortness of breath after limited exertion – walking one and a half blocks and or climbing 2 flights of stairs – and sharp, sternal chest pain since his April 2003 biopsy. (R. 242). Nevertheless, he admitted to smoking approximately a third of a pack of cigarettes a day as part of an ongoing, 30-year habit. (R. 242). Dr. Gong confirmed the existence of a systolic murmur and decreased breadth at right lung base. (R. 238). Dr. Gong reported that Mr. Gates had full capacity to bend, stand, sit, stoop, turn, grasp, and perform fine finger manipulations, with a 20-50% reduced ability to walk, climb, push and pull, and a 20% reduced physical capacity to engage in daily activities. (R. 240). Mr. Gates's range of motion in all his joints and hands was also normal, and his grip strength and manual dexterity were assessed as 5/5. (R. 241). Dr. Gong felt that Mr. Gates could lift no more than 20 pounds but that he could frequently lift 10 pounds. (R. 240). Further, Dr. Gong did not find any mental impairments that could impact Mr. Gates's daily living activities, pace, persistence, concentration, and capacity for social interaction. (R. 240)

Dr. Peter Biale examined Mr. Gates on July 16, 2003, also upon the Agency's request. (R.

6

234). Mr. Gates described his history of tuberculosis, for which he was prescribed medication, heart condition, and shortness of breath. (R. 234). Dr. Biale's examination revealed a full range of motion in all joints and back. (R. 235-36). Mr. Gates could ambulate freely and normally, get on and off the exam table without assistance, and grasp and grip with his hands unimpaired. (R. 235-36). Mr. Gates had no mental impairments or difficulty concentrating. (R. 236) Also, Mr. Gates's thorax appeared normal in contour with no deformities, his lungs were clear, and Mr. Gates could breathe normally. (R. 235-36). Chest expansion equal bilaterally, normal resonance on percussion, air entry good, no rales, rhonchi, wheezing, clubbing or cyanosis. (R. 235-36). Dr. Biale described the existence of a basal holosystolic heart murmur, possibility aortic in origin (R. 235), but reported normal systolic function in both chambers, without clicks. (R. 235).

Dr. T. Arjmand, a state agency physician, conducted a physical residual functional capacity ("RFC") assessment of Mr. Gates on July 28, 2003. (R. 179-85). Dr. Arjmand considered Mr. Gates's medical record, including his history of tuberculosis and past heart trouble, in conjunction with Mr. Gates's complaints of shortness of breath. (R. 185). Dr. Arjmand concluded that Mr. Gates's lungs were clear and that his condition was controlled with anti-tuberculosis medication. (R. 185). Mr. Gates had no significant neurological or sensory deficits, retained full motion of all joints, had 5/5 motor strength in the upper and lower extremities, and could ambulate freely without aid. (R. 185). Dr. Arjmand determined that Mr. Gates could occasionally lift and/or carry 20 pounds, frequently lift/carry 10 pounds, stand for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour work day, and push/pull in an unlimited capacity. (R. 180). The report also noted occasional postural limitations - climbing, stooping kneeling, crouching, crawling - with the exception of balancing, which Mr. Gates had no difficulty with, and cautioned that Mr. Gates should avoid

7

concentrated exposure to fumes, dust, and poorly ventilated areas. (R. 181-83). Furthermore, the report indicated that Mr. Gates did not have any manipulative impairments, nor did he have any problems with vision or communication. (R.182). Dr. Arjmand's assessment of Mr. Gates's residual functional capacity was affirmed by state agency physician William Conroy, M.D. (R. 179).

Mr. Gates also suffers from a degenerative joint disease in the knee, possibly resulting from an old football injury in high school that went untreated. (R. 192-93). He sought treatment on one occasion reflected in the record, on February 8, 2003, at which time there was no sensory deficit, swelling, or redness. (R. 193). He rated his pain as a "three" out of ten. (R. 192). His pain was relieved by Motrin, and he was prescribed 800mg of Motrin per eight-hour period and 325mg Tylenol. (R. 192-93). In October of 2001, Mr. Gates was diagnosed with irreversible Glaucoma in the right eye and mild uveitis in the same eye.[5] (251-54, 267-71). Vision testing demonstrated that Mr. Gates retained 20/20 vision in his left eye and 20/40 in the right. (R. 254). With both eyes, his visual acuity is 20/20. (R. 254). He is currently on a steroidal anti-inflammatory, Prednisone, for his uveitis. (R. 353). Furthermore, Mr. Gates has Syphilis, for which he is also being treated. (R. 211). Finally, records indicated that Mr. Gates was diagnosed with a partially collapsed lung ("atelectasis") in April of 2003 before his surgery (R. 332) and iron deficiency anemia, which could possibly develop into a chronic disease. (R. 276).

## B.

## Mr. Gates's Hearing Testimony

At his hearing, Mr. Gates testified that he got dizzy more often than he used to, that he was

---

[5] Uveitis is inflammation of the uvea, which is the middle layer of the eye, made up of the cornea, ciliary body and the choroid. www.mercksource.com. (R. 251-54, 267-71).

generally weak, could not "do much," and that his prescribed medications did not help. (R. 26-7). Despite his weak condition, Mr. Gates had not returned to the doctor since July 2005, his reasoning being that he "was intending to go and see him, but I just didn't have the car fare to get down there" (R. 27-28). Mr. Gates also thought that he needed surgery, but that the doctors were for some reason prolonging this scheduled operation. (R. 25-27). Mr. Gates testified repeatedly to general fatigue and shortness of breath, and that these symptoms prevented him from walking more than 2 bocks without stopping to recover. (R. 29-30). Mr. Gates explained that a few times a month, his symptoms prevented him from essentially doing anything. (R. 33). Mr. Gates also spoke of his knee pain which contributed to his difficulty walking. (R. 30).

With regard to his capacity to move around, Mr. Gates explained that he could do housework for 15 minutes before having to sit and rest. (R. 31). After resting for 15-30 minutes, Mr. Gates could resume such activity. (R. 31). Mr. Gates also testified that he could stand for 30-45 minutes before having to sit down and rest for another 15-30 minutes. (R. 31). He could walk about two blocks before needing to rest. (R. 30). Mr. Gates claimed that he could sit for an hour or two before needing to lie down and explained that he could concentrate for 45 minutes to an hour, at least in terms of watching television or reading, before having to lie down again and rest. (R. 32). Mr. Gates stated that 3-4 times a month he experienced dizziness and lightheadedness and that his right eye was "like a fog," making it difficult for him to visualize letters and the like. (R. 33-4). Mr. Gates then talked about his chest pain, describing it as "coming out of nowhere," and lasting for 1-5 minutes. (R. 36). Mr. Gates alleged that the pain was not tied to exertion, but that it might occur while he was sitting, standing, or walking. (R. 36). After each episode, Mr. Gates would have to rest for 15-20 minutes before resuming his activities. (R. 36).

9

## C.

## Medical Expert Testimony

Dr. Hugh Savage, a cardiologist (R. 111-118), testified as a medical expert at Mr. Gates's hearing. After examining Mr. Gates's cardiology notes, echocardiograph results, and the medical record overall, he concluded that, Mr. Gates had no coronary artery disease or narrowing of the vessels, and that Mr. Gates's heart was pumping blood normally, indicated by an ejection fraction of 55. (R. 42-44). On direct examination by the ALJ, Dr. Savage concurred with Dr. Arjman's July 28, 2003 assessment of Mr. Gates's residual functional capacity. (R. 45). Dr. Savage agreed that Mr. Gates could perform light work, meaning he could occasionally lift 20 pounds, frequently lift 10 pounds, could stand, sit, and/or walk for about 6 hours in an 8-hour workday, and that Mr. Gates's ability to push or pull was unlimited. (R. 45, 53). The doctor then testified that when a patient such as Mr. Gates goes through a pericardial window procedure, the surgery is usually accompanied by some chest pain due to fibrosis and inflammation. (R. 46). Dr. Savage explained that that type of pain was musculoskeletal, that it had nothing to do with narrowing of arteries or constricted blood flow to the heart and was consequently of less concern. (R. 46). Dr. Savage did not think Mr. Gates's pain was a farce, but characterized it as a residual-type chest discomfort that only occurred a few times a month and that did not warrant aggressive therapy. (R. 54). In general, the cardiologist opined that Mr. Gates's medical records showed that the chest pain was not cardiac in origin and that it was not "bad chest pain." (R. 46-47). Dr. Savage also explained that Mr. Gates's claims of chest pains, fatigue, and shortness of breath were unusual considering his ejection fraction was normal which signified good movement of blood through the heart. (R. 48)

Dr. Savage then discussed his conclusions from Mr. Gates's medical records, in particular

10

inpatient notes from April 17, 2003. (R. 48). He saw no evidence of persistent shortness of breath, repeated complaints by Mr. Gates, nor did he find any evidence of unrelenting pain in the stretch of time after Mr. Gates's surgery. (R. 49, 51). He noted that Mr. Gates experienced sporadic pains after his surgery (R. 49), but nothing that caused doctors to probe further or explore the possibility of stronger pain killers or additional medication. (R. at 49, 51). Dr. Savage testified that Mr. Gates needed the surgery to open the pericardium to prevent the risk of fluid buildup, which was obviously dangerous, and that Mr. Gates received that necessary surgery in 2003. (R. 50, 51). Dr. Savage then acknowledged that there was one report that indicated Mr. Gates did in fact have a lingering heart condition – aortic insufficiency or "severe aortic regurgitation" – but that such a condition would allow a person to engage in "sedentary-type activity as long as you control the blood pressure very well . . . ." (R. 52). He explained that he meant lifting "10 pounds frequently and 20 pounds occasionally" – in other words, light work. (R. 52-53). The cardiologist concluded his testimony by explaining that Mr. Gates's symptoms of lightheadedness, dizziness, and fatigue were non-specific and, when considered in light of the medical record and Mr. Gates's normal ejection fraction, probably were not cardiac in origin or stemming from aortic insufficiency. (R. 55-56). Dr. Savage opined that Mr. Gates's heart condition, nonetheless, should be monitored carefully, and that he was surprised that doctors had not prescribed Lanoxin to reduce his heart volume. (R. 56).

## III.

## THE ADMINISTRATIVE LAW JUDGE'S RULING

The ALJ denied Mr. Gates's claim for DIB and SSI. (R. 21). After determining that Mr. Gates had not engaged in substantial gainful activity ("SGA"), the ALJ found the Mr. Gates had three severe impairments: (1) pulmonary tuberculosis; (2) moderate pericardial effusion, which was

11

drained after Mr. Gates's April 2003 biopsy, and; (3) pleurisy. (R. 18). Next, the ALJ determined that Mr. Gates's condition did not match one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, thus requiring that the analysis proceed to steps 4 and 5. (R. 19). Accordingly, the ALJ went on to assess Mr. Gates's residual functional capacity ("RFC") and concluded that Mr. Gates could perform light work: lift or carry 10 pounds frequently and 20 pounds occasionally, and sit, stand or walk for 6 hours in an 8-hour workday. (R. 19).

In reaching his decision, the ALJ considered Mr. Gates's symptoms, the medical record, and related opinion evidence, and came to the general conclusion that despite his severe impairments, Mr. Gates could nonetheless perform light work. (R. 19). The ALJ reasoned that although Mr. Gates's impairments could reasonably have been expected to produce his alleged symptoms of chest pain and shortness of breath, Mr. Gates's statements concerning the severity, duration, limiting effects of those symptoms were not entirely credible. (R. 19). In support of this determination, the ALJ then pointed out that discrepancies between Mr. Gates's testimony at the hearing regarding his chest pain and shortness of breath (that he is only able to walk 1 block) and the objective medical record which shows that Mr. Gates's tuberculosis could be treated with medication and that Mr. Gates's condition had resolved with treatment. (R. 19). The ALJ further noted the inconsistency between Mr. Gates's hearing testimony and the result of Mr. Gates's physical examinations, which demonstrate that Mr. Gates's range of motion in all joints is normal, that he can ambulate freely without assistive devices, and that his lungs are clear. (R. at 19). In assessing Mr. Gates's RFC, the ALJ considered the testimony of three examining physicians and a medical expert at the hearing, *all of whom agreed that Mr. Gates could perform light work, carry things, stand, walk and/or sit for about 6 hours in an 8-hour workday, get around freely, and that Mr. Gates had no restrictions in*

12

*joint mobility*. (R. 19-20). Also, the ALJ noted that examining physicians opined that, even though Mr. Gates had some reduced capacity for walking and a history of pericardial effusion and pleurisy, that his condition could be controlled with anti-TB medication, his lungs were currently clear, and his chest pain was likely not of cardiac origin. (R. 19-20)

Progressing through steps 4 and 5, the ALJ found that, although Mr. Gates's exertional limitations prevented him from performing the necessary functions associated with his former vocation (janitor), he was nonetheless not disabled under Rule 202.21 of the Medical-Vocational Guidelines when his age, education and work experience were considered. (R. 20-21). Accordingly, the ALJ concluded that Mr. Gates could perform jobs that exist in significant numbers in the national economy given his age, education, work experience, and RFC. (R. 21).

# IV.
# DISCUSSION

## A.
## Substantial Evidence Standard

The issue on review is not whether Mr. Gates is disabled, but whether the ALJ's findings were supported by substantial evidence. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389 401 (1971). The Commissioner's factual findings are entitled to deference; the reviewing court is not to decide anew issues of fact where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled. *Binion*, 108 F.3d at 782. The court may not reweigh evidence or substitute its own judgment for that of the Social Security Administration. *Id.; Skinner, supra.* This same deference

13

is not applicable to the Commissioner's rulings on questions of law, however, and the court will reverse the decision in the event of an error of law regardless of the volume of evidence present supporting the ruling. *Id.*

Although the standard is deferential, the court must still undertake a critical review of the evidence, rather than simply rubber stamp the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The court considers all the evidence, both that tending to support and that tending to negate the Commissioner's decision, and ascertains whether the ALJ presented an adequate discussion of the relevant issues. In order for a court to affirm a denial of benefits, the ALJ must have articulated the reasons for his decision at some minimal level. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Dixon v. Massonari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ must build an accurate and logical bridge from the evidence to the conclusion. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006); *Dixon*, 270 F.3d at 1176. Although the ALJ need not address every last piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

## B.

## The Required Five-Step Sequential Analysis

Social Security Regulations require the ALJ to conduct a five-step sequential analysis to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;
2) does the plaintiff have a severe impairment;
3) does the plaintiff have an impairment that meets or equals one of the impairments

14

listed as disabling in the Commissioner's regulations (is plaintiff "conclusively disabled" where an affirmative response concludes the determination);

4) (here the RFC factor comes into play) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy.

20 C.F.R. § 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-2 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425, F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point other than step 3 halts the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. § 404.1520; *Stein*, at 44. The Plaintiff bears the burden of proof through step 4; if step 4 is met, the burden shifts to the Commissioner at step 5. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

Mr. Gates finds fault with three aspects of the ALJ's decision. First, he contends that the ALJ failed to properly evaluate the credibility of his complaints. Second, he argues that the ALJ failed to properly consider all of his limitations in determining his residual functional capacity ("RFC"). Finally, Mr. Gates submits that the ALJ failed to address certain significant lines of evidence, including his knee pain, chest pain, heart murmur, congestive heart failure, glaucoma, and inconsistencies in the medical expert's testimony.[6]

---

[6] Mr. Gates actually claims there were inconsistencies in the *vocational* expert's testimony (*Plaintiff's Memorandum*, at 11) but, as there was no vocational expert, this is clearly an error, and meant to refer to the medical expert.

15

## The ALJ Did Not Improperly Discredit Mr. Gates's Testimony

The law affords an ALJ substantial discretion in making threshold determinations of witness credibility. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ is in the best position to determine a witness's truthfulness and forthrightness; thus, this court will not overturn an ALJ's credibility determination unless it is 'patently wrong'). A reviewing court must afford an ALJ's credibility finding "considerable deference" and can overturn it only if "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). *See also Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007); *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)(citations omitted). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). *See also Skinner*, 478 F.3d at 842. Here, Mr. Gates argues that the ALJ failed to properly evaluate his complaints of fatigue, shortness of breath, knee pain, and chest pain. (*Plaintiff's Memorandum*, at 6-10,12, 13-14).

"[O]f course, the Administrative law judge did not have to believe" Mr. Gates. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *Accord Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir.2006). He was entitled – indeed, he was obligated – to determine the validity of Mr. Gates's testimony. But, making judgments about who is telling the truth is a tricky business. The reviewing court lacks direct access to the witnesses, lacks the trier's immersion in the case as a whole, and lacks the specialized tribunal's experience with the type of case under review. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.2004). *Compare Ashcraft v. Tennessee*, 322 U.S. 143, 171 (1944) (Jackson, J., dissenting) ("a few minutes observation of the parties in the courtroom is more

16

informing than reams of cold record."). That is why appellate review of credibility determinations, especially when made by specialists such as the administrative law judges of the Social Security Administration, is entitled to "special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000).

Still, judges often overestimate their ability to sift true from false testimony by assessing demeanor, "which is a form of lie detector without the electrodes and graph paper." *Djedovic v. Gonzales*, 441 F.3d 547, 551 (7th Cir.2006). Judge Posner has cautioned that it is extremely difficult to determine whether a witness is testifying truthfully, and, much pious lore to the contrary notwithstanding, demeanor is often an unreliable guide to truthfulness. *See Consolidation Services v. KeyBank Nat. Ass'n*, 185 F.3d 817, 820 (7th Cir.1999); *United States v. Wells*, 154 F.3d 412, 414 (7th Cir.1998); *Carradine*, 360 F.3d at 751. Nonetheless, demeanor continues to be a significant component of credibility determinations. *Cf. Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir.2005), *cert. denied*, --- U.S. ----, 126 S.Ct. 2862 (2006); *United States v. Bruscino*, 687 F.2d 938, 941 (7th Cir.1982) (en banc )(ability of judge to observe demeanor of jurors). Indeed, the Supreme Court has said that the demeanor of a witness may satisfy the tribunal not only that the witness's testimony is not true but that the truth is the opposite of his story, "for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962). *See also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir.2001)("completely proper in making credibility determinations" in social security case for ALJ to rely on claimant's demeanor).

Perhaps the ALJ in this case was sensitive to the inherent difficulty in making credibility

judgments based solely on demeanor, because he chose not to decide the case on demeanor, but rather to follow the most responsible of courses and to review the entire record as SSR 96-7p requires. *See* 1996 WL 374186, *1.[7] That ruling is consistent with the Seventh Circuit's recognition that credibility involves more than demeanor, *Indiana Metal Products v. NLRB*, 442 F.2d 46 (7th Cir.1971), and that documents or objective evidence may contradict the witness' story, or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it. *See Pinpoint Inc. v. Amazon.Com, Inc.*, 347 F.Supp.2d 579, 583 (N.D.Ill.2004) (Posner, J.) (sitting by designation).[8]

It is an ALJ's basic obligation to scrupulously and conscientiously explore all relevant facts that bear on the claimant's capacity to work or his entitlement to benefits. *Cf. Heckler v. Campbell*, 461 U.S. 458 (1983); *Johnson v. Barnhart*, 449 F.3d 804 (7th Cir.2006); *Madrid v. Barnhart*, 447 F.3d 788 (10th Cir.2006). That is precisely what the ALJ in this case did. SSR 96-7p instructs ALJs to "compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the 'other sources' defined in 20 CFR 404.1513(e) and 416.913(e)." *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000).

---

[7] Social Security rulings (SSRs) are interpretive rules intended to offer guidance to agency adjudicators and are binding on all components of the Social Security Administration. *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); 20 C.F.R. § 402.35(b)(1).

[8] Indeed, where such factors are present, a court of appeals can find clear error in a finding of credibility based on demeanor, even though such determinations are, as a matter of practice, usually insulated from appellate review. *Ginsu Products, Inc. v. Dart Industries, Inc.*, 786 F.2d 260, 263 (7th Cir.1986).

The ruling instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR-96-7p; *Prochaska*, 454 F.3d at 738. And, it requires an ALJ to consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). SSR 96-7p; *Arnold*, 473 F.3d at 822-823; *Prochaska*, 454 F.3d at 738; *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). The ALJ, however, is not required by the regulations or the Seventh Circuit to discuss *every* factor listed in the SSR. *See, e.g., Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005)(ALJ's credibility finding upheld where ALJ considered course of treatment and objective medical evidence); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999)(ALJ only discussed medical evidence, claimant's vagueness, evasiveness, and indefiniteness in answering questions); *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir.1993)(citing medical evidence, claimant's statements, daily activities, and the ALJ's observations of claimant as factors to consider).

Despite Mr. Gates's allegations that his ability to work was compromised by his shortness of breath, the ALJ noted that the medical record demonstrated otherwise. Mr. Gates did, indeed, suffer from shortness of breath as a result of pericardial effusion and tuberculosis, but underwent a surgical procedure and treatment that, according to his treating physicians, resolved the situation. Echocardiography confirmed their assessment. Even Mr. Gates, time and again, during follow up examinations, indicated he was feeling better and denied experiencing shortness of breath. (R. 192, 226, 235-36, 300, 316, 317, 318, 321). Despite his own comments to physicians, Mr. Gates describes the record as demonstrated that he has "consistently complained of shortness of breath."

19

(*Plaintiff's Memorandum*, at 8). This is clearly not the case, and a review of Mr. Gates's citations to the record reveal complaints prior to surgery and treatment (R. 199-200, 208-12, 271, 273, 282, 286, 301), references to his history of such complaints (R. 185, 245, 377), or "without" shortness of breath at all (R. 316, 318). There were some complaints of shortness of breath or references to shortness of breath upon exertion, such as climbing stairs (226, 236-37, 309, 313), but these were isolated instances in light of the balance of the record.

Mr. Gates also questions the ALJ's treatment of his complaints of chest pain and related cardiac condition. Again, however, like Mr. Gates's complaints of shortness of breath, his complaints of chest pain to physicians were isolated. He either denied any chest pain (R. 192, 195, 316, 317, 318, 321) or related minimal complaints, such as a 30 second pain, once or twice a week, unrelated to any exertion. (R. 191). And, also like the issue of shortness of breath, the majority of Mr. Gates's references to complaints of chest pain in the record (*Plaintiff's Memorandum*, at 13) were prior to his treatment. (R. 199-201, 208, 212, 281, 286). In addition, any pain appeared related to the surgical procedure he underwent to resolve his pericardial effusion. The medical expert, Dr. Savage, testified regarding this at length during the hearing, explaining the difference between "bad" chest pain, and the residual pain from the surgical procedure. (R. 45-48). Mr. Gates' moderate aortic insufficiency and mild aortic stenosis were also termed "asymptomatic." (R. 196-197, 379). An echocardiogram indicated that Mr. Gates had a normal ejection fraction which, as Dr. Savage testified, suggested that any chest pain was not of cardiac origin. (R. 44). The doctor also testified that the complaints Mr. Gates expressed at the hearing were atypical of one who had "good movement of blood through the heart" which was documented by Mr. Gates's ECG. (R. 48-49, 55).

As for Mr. Gates's right knee, there is a dearth of both medical evidence and his own

20

complaints. The record demonstrates that he sought treatment for knee pain on one occasion, and that while an x-ray revealed degenerative joint disease, there was no sensory deficit, swelling, or redness. (R. 193). His pain, which he rated as just a 3 out of 10, was relieved by Motrin, and he was prescribed 800mg of Motrin per eight-hour period and 325mg Tylenol. (R. 192-93).

It is an ALJ's basic obligation to scrupulously and conscientiously explore all relevant facts that bear on the claimant's capacity to work or his entitlement to benefits. *Cf. Heckler v. Campbell*, 461 U.S. 458 (1983); *Johnson v. Barnhart*, 449 F.3d 804 (7th Cir.2006); *Madrid v. Barnhart*, 447 F.3d 788 (10th Cir.2006). That is precisely what the ALJ in this case did. SSR 96-7p instructs ALJs to "compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the 'other sources' defined in 20 CFR 404.1513(c) and 416.913(e)." *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000). Here, the record consists of minimal, sporadic, and isolated complaints of shortness of breath and chest pain following Mr. Gates's treatment. Complaints of knee pain are rarer still. Clearly, Mr. Gates's statements to his physicians do not depict a condition as severe as that he hoped to depict for the ALJ. This inconsistency is a valid basis for the ALJ's credibility finding. *See Sienkiewicz*, 409 F.3d at 804 (ALJ's credibility finding supported by record of plaintiff only intermittently voicing complaints to physician to seek treatment).

The objective medical evidence provides an additional basis. Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not necessarily be accepted insofar as they clash with other, objective medical evidence in the record.

21

*Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. Jan. 16, 2007); *Sienkiewicz*, 409 F.3d at 803 (ALJ properly found plaintiff not credible where her complaints of extreme pain were inconsistent with the findings of all the doctors who examined her). Here, echocardiography shows that his pericardial effusion has resolved and his ejection fraction is normal. The medical expert – upon whose testimony the ALJ properly relied (R. 20) – explained the significance of the tests and how the results related to Mr. Gates's ability to work. *See Arnold*, 473 F.3d at 823 (ALJ properly relied on medical expert's assessment of the record); *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006)(recommending that ALJs relate medical jargon to a claimant's ability to function). The ALJ properly considered the objective medical evidence in finding Mr. Gates's complaints less than credible.

## 2.

### The ALJ Properly Determined Mr. Gates's Residual Functional Capacity

Mr. Gates argues that, in determining that he could perform a full range of light work, the ALJ failed to considered all of his limitations. Specifically, Mr. Gates submits that despite the fact that the ALJ essentially adopted to RFC found by Dr. Arjmand, the ALJ ignored the fact that the doctor found he "could never balance, could occasionally climb, stoop, kneel, crouch, and crawl, and had to avoid exposure to fumes." (*Plaintiff's Memorandum*, at 10). But, first of all, this is a mischaracterization of Dr. Arjmand's findings. The doctor concluded that Mr. Gates could *occasionally* balance, but never climb ladders, ropes, or scaffolding, and avoid *concentrated* exposure to fumes. (R. 181). That being the case, as will be made clear, the ALJ's conclusion that Mr. Gates could perform light work is not undermined by any of these limitations.

Mr. Gates moves from a misreading of the record to a misstatement of a case's holding. He

cites *Luna v. Shalala*, 22 F.3d 687 (7th Cir. 1994) as holding that an ALJ erred by failing to consult a vocational expert when use of the Medical Vocational Guidelines was inappropriate – not once, but twice. (*Plaintiff's Memorandum*, at 10; *Plaintiff's Reply Brief*, at 5). In fact, the court in *Luna* held that the ALJ was not required to consult a vocational expert because he properly concluded that the plaintiff's capacity for a range of sedentary work was not significantly impacted by additional restrictions. 22 F.3d at 692; *see also Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001)(("We have clearly stated that where a nonexertional limitation might substantially reduce a range of work an individual can perform, the use of the grids would be inappropriate and the ALJ must consult a vocational expert."). Despite Mr. Gates's misreading of *Luna*, the case is nevertheless instructive here. As in *Luna*, the ALJ here properly employed the Medical-Vocational Guidelines, because the evidence demonstrated that Mr. Gates's capacity for light work was not significantly impacted by additional restrictions.

SSR 83-14 and SSR 85-15 provide guidance on what constitutes a capacity for light work, proper use of the Medical-Vocational Guidelines, and necessary resort to vocational expert testimony. SSR 83-14 informs that "[r]elatively few jobs in the national economy require ascending or descending ladders or scaffolding." SSR 83-14, 1983 WL 31254, *2. Such non-exertional limitations are deemed to "have little or no effect on the unskilled light occupational base." *Id.* At *5. Mr. Gates's inability to perform those tasks, then, would not significantly impact the range of light work he could perform. Similarly, Mr. Gates's ability to occasionally climb, stoop, kneel, crouch, and crawl would not significantly diminish the range of light work he could perform. SSR 83-14, 1983 WL 31254, *2 (". . . to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only

23

occasionally (from very little up to one-third of the time, depending on the particular job)."); SSR 85-15, 1985 WL 56857, *7 ("If a person can stoop occasionally . . . in order to lift objects, the sedentary and light occupational base is virtually intact. . . . and limitations on the ability to crawl would be of little significance in the broad world of work. This is also true of kneeling."). And finally, SSR 83-14 also provides that environmental restrictions – such as Mr. Gates's need to avoid concentrated exposure to fumes – "would also not affect the potential unskilled light occupational base." SSR 83-14, 1983 WL 31254, *5.

In *Fast v. Barnhart*, 397 F.3d 468 (7th Cir. 2005), the court explained the ALJ's duties at step five of a sequential evaluation, and when the ALJ may, and may not, employ the Medical-Vocational Guidelines or "grids":

> At step five of the sequential analysis, an ALJ must determine (taking into account the step four finding that the claimant can no longer perform her past work) whether the person can do any other work that exists in the national or regional economy. To this end, the ALJ may use the grids to determine whether other jobs exist in the national or regional economy that a claimant can perform. The grids, however, generally take account only of exertional impairments. Exertional impairments are those that affect the claimant's "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." . . . Where a nonexertional limitation might substantially reduce the range of work an individual can perform, use of the grids is inappropriate and the ALJ must consult a [vocational expert].

397 F.3d at 470(citations omitted); *see also Luna*, 22 F.3d at 692; *Zurawski*, 245 F.3d at 889. Here, none of Mr. Gates's non-exertional limitations are of a nature that would substantially reduce the range of light work he could perform. Given these insubstantial limitations, and Mr. Gates's capacity for light work, the ALJ properly employed the Medical-Vocational Guidelines to find Mr. Gates not disabled.

In addition, Mr. Gates also argues that the ALJ failed to include in his RFC finding all of the

limitations he alleged to suffer at the administrative hearing. (*Plaintiff's Memorandum*, at 11). But the ALJ dismissed much of that testimony as not credible – a finding that was not "patently wrong." Because he found Mr. Gates not entirely credible, he was not required to accept in its entirety his testimony about his limitations and incorporate those into his RFC. *Sienkiewicz*, 409 F.3d at 804. Thus, the ALJ did not err by failing to reflect each of Mr. Gates's complaints in his RFC finding.

**3.**

## The ALJ Did Not Improperly Fail To Analyze Significant Lines Of Evidence

Finally, Mr. Gates argues that the ALJ failed to analyze his "Knee Pain, Chest Pain, Heart Murmur, Congestive Heart Failure, Glaucoma, Reduction in Walking, and Evidence Showing the Vocational [sic] Expert's Testimony was Inconsistent." (*Plaintiff's Memorandum*, at 11). While an ALJ need not discuss every piece of evidence in the record, an ALJ may not ignore an entire line of evidence that contradicts the ruling. *Indorato v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). But the ALJ did not commit such an error here.

Obviously, the ALJ dealt with Mr. Gates's complaints regarding his knee and his heart condition, as is clear from the discussion on the ALJ's credibility finding. The ALJ did not find these impairments disabling and did not credit Mr. Gates's complaints, but that is not the equivalent of ignoring a line of evidence. Indeed, it is Mr. Gates who fails to pay adequate attention to the record because, as before, his argument is based on mischaracterizations of the record referencing his complaints. (*Plaintiff's Memorandum*, at 13; *Plaintiff's Reply* at 7). As for Mr. Gates's diagnosis of glaucoma or uveitis, the ALJ did not find it to be a severe impairment. Although Mr.

Gates was diagnosed with uveitis and glaucoma in the right eye, the record shows only that he was given anti-inflammatory medication and that he maintained anywhere between 20/40 and 20/60 vision in his affected eye. (R. 251-57, 267-71). More importantly, together, his visual acuity was 20/20. (R. 271).[9] Nothing in the record indicates that his vision was severely impaired or that he needed advanced pain killers or other more progressive medications associated with a severe irreversible eye condition.

Mr. Gates's argument about the ALJ ignoring his "Reduction in Walking" ostensibly stems from Dr. Gong's finding that Mr. Gates's capacity for walking was reduced by 20-50%. (*Plaintiff's Memorandum*, at 12). The ALJ clearly mentioned this finding (R. 19), however, so it is not as though the ALJ ignored a line of evidence. In addition, a 20-50% reduction in capacity for walking would, in terms of an eight-hour workday, means a capacity to walk for 4 to just over 6½ hours. The ALJ found that Mr. Gates could stand or walk up to six hours a day, which would fall within the range Dr. Gong defined.

Finally, Mr. Gates argues that the ALJ ignored a conflict in the medical expert's testimony; specifically, that Dr. Savage testified both that Mr. Gates was limited to sedentary work and to light work. (*Plaintiff's Memorandum*, at 13). But even a cursory reading of the transcript demonstrates that Dr. Savage misspoke when he said "sedentary-type activity" (R. 52), and that he immediately corrected himself by explaining that Mr. Gates could lift ten pounds frequently and twenty pounds occasionally. (R. 53). This is not a basis to overturn the ALJ's decision. It was merely a mistake. Mistakes are inherent in the human condition. *Silva v. Fortis Benefits*, 473 F.Supp.2d 819, 823

---

[9] By way of comparison, 20/40 vision in at least one eye is required to pass a driving test. http://www.agingeye.net/visionbasics/healthyvision.php. Even Mr. Gates's worse eye meets this standard.

(N.D.Ill. 2006). The most gifted of judges make them. *Willy v. Coastal Corp.,* 503 U.S. 131, 139 (1992); *Marek v. Chesny,* 473 U.S. 1, 13 (1985)(Rehnquist, J., concurring); *Olympia Equipment Leasing Co. v. Western Union,* 802 F.2d 217, 219 (7th Cir.1986). And certainly, even Mr. Gates has made several here, whether they be a misreading of a case, some misreadings of the record, or a reference to a vocational expert where one did not appear.

In light of the errors in Mr. Gates's case citation and reading of the record, it is ironic that he charges the ALJ failed "to build an accurate and logical bridge" because he ignored Dr. Savage's misstatement. (*Plaintiff's Memorandum,* at 13). The requirement of a "logical bridge" exists to allow for a *meaningful review* of the ALJ's opinion. *Scott,* 297 F.3d at 595. While there is apparent room for debate in this Circuit as to what is necessary for a "logical bridge,"[10] any meaningful review must begin with an attentive reading of the record and the ALJ's decision. When that is undertaken here, it must be concluded that the ALJ's decision is both adequately articulated and supported by substantial evidence.

## V.

## CONCLUSION

In this case, Mr. Gates, like many others applying for disability benefits, suffers from a

---

[10] Not infrequently, the Court of Appeals reverses, on *de novo* review, *Dixon,* 270 F.3d at 1176; *Groves v. Apfel,* 148 F.3d 809, 811 (7th Cir.1998), decisions of the ALJs even where the district court has found the logical bridge easy to cross: *Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006); *Young v. Barnhart,* 362 F.3d 995, 1002 (7th Cir. 2004); *Golembiewski v. Barnhart,* 322 F.3d 912 (7th Cir. 2003); *Blakes ex rel. Wolfe v. Barnhart,* 331 F.3d 565, 569 (7th Cir. 2003); *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 788 (7th Cir. 2003); *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003); *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002); *Steele v. Barnhart,* 290 F.3d 936 (7th Cir. 2002); *Zurawski v. Halter,* 245 F.3d 881 (7th Cir. 2001); *Hickman v. Apfel,* 187 F.3d 683, 689 (7th Cir. 1999); *Clifford v. Apfel,* 227 F.3d 863 (7th Cir. 2000); *Sarchet v. Chater,* 78 F.3d 305 (7th Cir. 1996); *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir. 1994). Similar results have obtained in a substantial number of unpublished opinions.

variety of ailments, which makes the review the ALJ's decision that much more difficult. Ailments are not disabilities, however, and the record shows that Mr. Gates has good blood flow through his heart, that his pericardial effusion has resolved, and that the great majority of his complaints were from prior to his treatment. It also shows that his degenerative joint disease in his knee has occasioned only one trip to the doctor for treatment, and that despite his glaucoma and uveitis, he retains 20/20 vision overall.

Might the ALJ's decision have been more lengthy or painstaking, as the plaintiff suggests? Perhaps, but so can all judicial decisions as Judge Kozinski's story of the master door craftsman illustrates. *See* Jeffrey Cole, *My Afternoon with Alex: An Interview With Judge Kozinski*, 30 LITIGATION 6, 16 (Summer 2004).[11] But to demand that it be so crosses from substantial evidence review to nit-picking. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999)(Posner, C.J.); *see also Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)("When a court remands a case with an order to write a better opinion, it clogs the queue in two ways – first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases)."). Substantial evidence supports the ALJ's decision that Mr. Gates can perform light work and is not disabled under the Act.

---

[11] "I tell my clerks the story of the master brass door maker, who was explaining to his apprentice all of the many, many steps that go into casting, the buffing, and the endless sanding and resanding of a brass door. When asked by the apprentice, 'But when is it ever done?' the master craftsman says, 'It's never done. They just take it away.' One of the traps of this job is nobody ever comes and takes it away. Of course, at some point you have to say, enough is enough, and I have to go on and do something else."

The Commissioner's motion for summary judgment is GRANTED. The Plaintiff's motion

for reversal and remand is DENIED.

**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 4-30-07